First case, Stockstill v. City of Picayune. We'll hear first from Mr. Kellum. Thank you, Your Honor. May it please the Court. My name is Nate Kellum, and I represent the appellant, Jeremy Stockstill. Mr. Stockstill comes to the Court seeking relief from two festival rules that have been adopted and enforced by the City of Picayune. One banning literature distribution, and the other banning amplification. Both rules take place in traditional public fora, and both rules are unconstitutional for three significant reasons. One is that Picayune's stated interests, the reasons that they set out for the basis for enforcing these rules, are contrived. They're invalid. They're inadequate. The second significant reason why these rules are unconstitutional is because even assuming that some legitimate interest exists, Picayune fails to draw a connection between their two rules, that curb speech, and any legitimate interest. And then the third reason is that the enforcement of these two rules have the effect of severely limiting Mr. Stockstill's expression in a traditional public forum. So for these three reasons, the two rules are unconstitutional. The first reason, dealing with the stated interest, that's found on page 124 of the Record on Appeal, and that's part of Chief Brian Dalsey's declaration. He's the chief of the Picayune Police Department, and he sets out really the only evidence that we have in the Record regarding the interest, the reasons, why Picayune is enforcing these two rules. Well, does this come under the heading of a picture is worth a thousand words with that picture in the brief of the crowds on the streets of the festival? I don't think particularly relevant words, Judge Jevons, because there's really not any context for that picture other than that was taken in the past. It's not inaccurate, though. I don't believe it is inaccurate, but I think you just have to consider the context of it as far as the timing of it. Then also important is the place, because what it shows is it shows a picture of where the booths are located and where the buildings are located, and where Mr. Stockstill went to speech was actually in a wide open area close to the center of the festival where there are no buildings, there are no booths. Geographically, how large an area did the festival cover? I'm not completely sure. It takes up two streets, Your Honor. Well, it's really two parts of streets. It's East Canal Street and it's West Canal Street. And on the West Canal you have buildings and then you have a lot of booths set up, and then on the East Canal that's where you have the petting zoo and some other activities. And then in between you have this open area that's next to a park on one side and a wide open area on the other. And this is where Mr. Stockstill wanted to be and express his views. Do they have a designated entrance into the festival? No, it's a free festival. There's no admission, there's no ticket required, and so basically people can go wherever they can find a good parking place and start walking to it. And you can literally walk into it from any area. There's no fencing whatsoever. And so it's just a wide open space. And so when you take a look at really what their stated interests are for doing this, it really just doesn't add up. It doesn't suffice. The type of reasons that they state is they say it's for the comfort and enjoyment of the streets, it's for the success of local businesses and community events, it's for safety and protection, it's for convenient flow of pedestrian traffic, for litter control, noise reduction, and aesthetics. What if you didn't have a rule like this, though? Wouldn't the city stand the risk of having dozens of people in the fair handing out literature and dozens of people using amplifiers? I mean, wouldn't that really disturb the festival? There's no basis for presuming that. There's nothing inherent about handing out literature which would suggest it would disturb or disrupt traffic flow. There's nothing about even amplification because it's really a matter of noise. It's a matter of volume level. Well, when he used amplification, what did that mean? How loud was that? He said it was just at one point to protect his voice from going hoarse. So what does that mean? He wants to speak at a conversational level. What he likes to do, much like I am with this microphone, is that he wants to be able to speak where there's a noisy backdrop to be able to be heard as people are walking by. He doesn't yell, he doesn't shout. What he wants to do is he wants to speak at a conversational level. He does, but then what does the mic do to him? Well, the mic does the same thing, I guess, as perhaps it does here. I mean, it allows him to be heard. Otherwise, if he didn't have the amplifier and he spoke at a conversational level, no one would hear what he's saying. So that's really the corresponding right that he's seeking here. It's not just the right to speak, but also the right to be heard with the amplification. Speak above the crowd. Yes, I would say so, so they could be heard by passers-by. Really, when you take a look at either one of these, when you take a look at amplification, a legitimate interest that, and these are actually found in cases that have been cited by Picayune, would be to curb excessive noise. People probably don't even have boom boxes anymore, but would this ordinance cover somebody who walked into the festival and played a boom box with some kind of speech on it? That's a good question. Judge, I think I might have a boom box. I may be one of the few that do. If one was to play a speech on it, perhaps. One problem with the rule, in addition to its breadth, is that it's unwritten, so it's somewhat malleable. So I don't know if it's clear whether or not it would apply to that or not. But what it does do is it bans amplification, and certainly that would include Mr. Stockstill's use of an amplifier. And it's under any circumstances, no matter what the volume level happens to be. And I think that's a constitutional concern, because we're talking about a traditional public forum. It's a public street that remains a public street. And the Supreme Court decisions have recognized that there is a right to use amplified speech, and yet they ban all of it. What about Ward v. Rock v. Racism? I think that's a great case, because what that case shows us is that what's appropriate is to have some regulation of amplification so that it can deal with excessive noise. And just like with Kovacs v. Cooper, it can deal with loud and raucous noises. But a flat ban on amplification, which was not found in Ward, is something that just goes too far, because it doesn't even directly deal with a volume issue. What it deals with is the device itself. Well, it's a close question between having amplification and having disruption, though, isn't it? Well, if it's subjective, I believe it's probably a close question. But if it's objective, I don't think so. That could be measured by decibels. That could be measured by volume level. And whether someone's using amplification or they're not using amplification, then it's just a question, well, how loud are you? How loud are you in the backdrop of the noise? I mean, with regard to either of these regulations, isn't there also a question, is it narrowly tailored to serve a compelling interest and were there alternative avenues of communication? And, of course, we know they had bought a booth in the past. Actually, they didn't. That was something that I think Peking was mistaken about. Mr. Stocksville never purchased a booth. He's never involved in that. Now, his church, the church that he's involved in, that he happens to go to, they have purchased a booth in the past as an organization. But as an individual, he did not want to pay $125 to use the booth. But if his church had bought a booth, he could have spoken from there, couldn't he? Well, I think there have been a couple concerns. One is that year they didn't. They didn't have a booth. And he can't control what his church does. Then also there's a concern of his ability to speak from a booth. He still can't use amplification even if he has a booth. And so the only thing he'd be able to do is to hand out literature. In that sense, he's severely limited because he's relegated to one spot. So, therefore, people have to come to him as opposed to people passing by and then gives them the option whether or not they could either take the literature or not. So that would be a real concern as far as an alternative. He could set up near the place where most people came into the festival or where a large part of the people came in, couldn't he? You know, the setup is such it is really difficult to determine where that would be because it is so wide open and it's set up in downtown. Well, wherever he sets up in the festival, he's not going to get to everybody. Well, he's in a pretty good location, though, Judge. If you take a look at it like that, the overhead pictures are shown in a record. That serves him in a record. Where he sets himself up, it's actually in the very center of the festival itself. So it goes on this one street, Canal Street, east to west. And so what you have is you basically have people go to the booths that are to the west. They go to the activities and the petting zoos to the east. And there's only really one way to go there, and that is to walk down Canal Street back and forth. And so he places himself in this particular area where he reaches really a lot of the crowd, probably not everybody, but he reaches certainly a sufficient number of people who are going to the festival. And that's his intended audience are the folks who are attending this festival. In contrast, if he's forced to go to some sidewalk outside, it's basically just he's limited to people who perhaps park in that area and then he can talk to as they're either going toward the festival or they're leaving it. And so it's really a significant difference as far as his ability to reach. They'd all want to be in the prime location. And if you had politicians who wanted to do some politics, they'd all want the prime area, wouldn't they? Well, perhaps. And then I guess what happens in that situation is people listen to whoever they want to listen to. They can accept whatever literature they want to accept or they can decline whatever they want to decline. There's really no, and that's a really important point here, is there's absolutely no proof in the record of two things, really. There's no proof of any concern about congestion. None. There is none. There's no proof. Well, that's true in any crowd situation, though. That there's no concern about congestion. I mean, you'd have a hard time showing me a case where a municipality cannot regulate time, place, and manner for the eventuality of group gatherings. It doesn't mean they necessarily can license them, but they can certainly have because they don't want people to be conducting riots. At least that used to be the case. Well, and I think it's certainly appropriate to try to deal with a riot, but the problem here is that they're presuming crowd congestion and yet there's absolutely no basis for either a concern about it at this festival ever. No witnesses testified that. No witnesses have said that. Isn't the Supreme Court case of Heffron very close to this? No. Well, in some respects. I mean, there are some similarities in which you have people gathering in a particular place, but that's really where the similarities end because in Heffron what you had is state fairgrounds, which are very different from city streets. And then also what's important in Heffron is you had a confined space. You had the fencing. You were asking earlier, Judge Davis, about the— Mr. Stocks is in a confined space? No, it's not confined, Judge, because there's no fencing. There's no gates. Well, that's why I referred to that. Yes, sir, but that's why I referred to that photo because that was a very crowded space. Certainly. This looked like Bourbon Street on a weekend. Well, it did have some similarities to Bourbon Street, actually, where you had like buildings on both sides and then you had a lot of people on the street. But that's just part of the festival. Actually, that's not the part where Mr. Stocks still was. And actually there's no showing that that's really even necessarily consistent with the type of crowds that you see out there. But the issue, and this is why it's different from Heffron, Heffron you actually have fencing where you force people in. You go into a closed area. And you're in this area with a lot of people. That's not true with the Picayune Street Festival because people have these wide open spaces where they feel they need some elbow room. It's easy to have it in case there are crowds. You just don't have the same type of concerns. And that's what the Sixth Circuit has found as a clear distinction. That was held in a Bays v. City of Fairbourn. That was held in a Saag v. City of Dearborn case. That was also held by the Eighth Circuit in the Johnson v. Minneapolis Park and Recreation Board case. In all those decisions, they held that Heffron really doesn't apply to street festivals that are open to the public. And the reason is because there's a clear distinction between a fair on a situated fairground where you have admitted entrants and tickets, and then where you have a wide open public street festival. Those are just two very different things or two very different venues. And also something that's very important that's mentioned in cases as well is a distinction between the type of speech. And that is between literature distribution and solicitation. And the Supreme Court has recognized this, too, is that in Heffron it's solicitation. That's what they were doing as part of their religion. They wanted to solicit money. And so that involves actual stoppage. So you have people in an enclosed space where you're actually stopping, which could conceivably block the path of people. And what the Supreme Court and what the Sixth and Eighth Circuit have held is that that's just not the situation with literature distribution. And the reason why is because you can hand out a piece of paper and someone could either take it or not take it, but even if they take it they just keep walking. And so it's a very different situation from solicitation, and that's why there's been differences between them. Unless there's further questions, I'll just reserve the rest of my time for rebuttal. Thank you, judges. Thank you, Mr. Kelley. Mr. Butler. Good morning, Your Honors. May it please the Court. This is an appeal from a request for what this Court has so often called a rare and extraordinary form of relief. Because the District Court did not abuse its discretion in denying Stocksdale's motion for a preliminary injunction, the District Court's order should be affirmed, in this case should be remanded for an adjudication on the merits. The starting point is that Stocksdale does not have an absolute right to free speech, even in a traditional public forum. The City of Picayune is free to enforce reasonable time, place, or manner restrictions so long as those restrictions are content neutral, narrowly tailored to an important governmental interest, and leave open alternative channels for communication. The voice amplification and literature distribution restrictions at issue in this case satisfy that criteria. It's very significant that there is no dispute in this case over content neutrality. Page 323 of the record shows Stocksdale's concession on this point in the District Court, and there's no contrary argument in his appellate brief. As we say in our brief, courts have frequently said that the most important part of the First Amendment analysis is the neutrality question. And that is so because at the heart of the First Amendment is a concern about viewpoint discrimination. Why bother to argue about it if there's no dispute? Well, because it's important to show that the Supreme Court cases say that the government has significant leeway when there is no dispute over content neutrality, Your Honor. So it's important to point out that this is a big distinction in other cases that Mr. Stocksdale relies upon. The ordinary context that these cases come up in is usually you have a gay pride festival and you have an evangelical preacher who wants to distribute literature at the gay pride festival. Courts very correctly have scrutinized those cases closely for fear that the government is inserting itself into the culture wars and choosing one message over another message. But that's not at all what we have here. Mr. Stocksdale is free to promote his message just like the other seven churches do at the festival and just like his own church has at past festivals, so long as he plays by the same rules that apply to everyone equally. So because there's no dispute over content neutrality, what he focuses heavily on is a second element, which is the narrowly tailoring to an important governmental interest. But the red herring in his argument is that he takes the position that Picayune's interest can only be important if there is substantial evidence of disruption at past festivals. But there is no support for that in Supreme Court precedent or any of this circuit's cases. Picayune has a right to prevent disruption at future festivals. We see this in many First Amendment contexts, for example, the school speech cases or the retaliation in public employment cases. The teaching of all these cases is that the government has a right to prevent potential disruption in the future. In other words, the city of Picayune does not have to sit back and wait for something bad to happen before it takes action to protect its interests. And the interests at issue in this place are certainly important ones, the most prevailing one being the interest that it has in promoting successful community events. The city of Picayune is a small town with a population of less than 11,000 people. This street festival brings as many as 35,000 people to that small town, and it's been around for 20 years. The nonprofit organization who puts the festival on, its whole purpose for being in existence is to promote the downtown revitalization of the city of Picayune. So the courts have... We articulate other related interests in the brief, such as the comfort and enjoyment of the people that attend this festival, their safety and protection, crowd control, all of these things that courts have often recognized to be important interests, Your Honors. And we need only articulate one, and most courts have not found that to be an overly taxing standard. What Stocksdale does is focuses on the second part of that standard, which is the narrowly tailoring part, but he fails to break down what narrowly tailoring really means. Narrowly tailoring, according to Ward, cannot be confused with a least restrictive means test. So the question before the court is not whether Picayune has come up with the most effective ways to protect its interests. The only question before the court is whether Picayune's interests would be less effective if they were not in place. And I would submit to the court that these are certainly effective ways to promote its interests because it's not difficult to imagine what this festival might look like if everyone were allowed to do what Mr. Stocksdale wants to do. And aggregation, according to Hefferon, is very important, and that's why the 7th Circuit case that we cite in our brief where Judge Mannion says that sound amplification at crowded street festivals, that's the prototypical type of reasonable time, place, or manner restriction. Well, he cites a couple of 6th Circuit cases that overturned similar regulations. What do you say about that? I think they're factually distinguishable, Your Honor. Two of the cases are one of the 6th Circuit cases and one of the 8th Circuit cases are not even unanimous panel opinions. One of them is in the summary judgment context. I think they're unfaithful to Hefferon, and they've also been significantly limited by the Supreme Court's recent decision in Williams v. Florida Bar, the 2015 case. Those cases focus on under-inclusiveness, and Mr. Stocksdale tries to introduce a false issue into this case by saying, well, Picayune's interests are under-inclusive because they don't address things like solicitation. I think he mentioned that a while ago. But there's two problems with that argument, one factual and one legal. As a factual matter, there is no evidence whatsoever in this record that solicitation has ever been permitted at the festival. And that's simply his way to try to pigeonhole this case into other cases where that's been a real issue. But more importantly, as a legal matter, in Williams v. Florida Bar, the Supreme Court said, and I'll quote this, that there is no freestanding prohibition under the First Amendment against under-inclusiveness, that the government does not have to alleviate all problems in one fell swoop, that they have a right to address those problems, the most pressing problems, as they arise. So those cases are distinguishable. He mentions Johnson v. Minnesota, the Eighth Circuit case. That one is particularly telling. Mr. Kellum actually represented the plaintiff in that case, and that was a gay pride festival, and there was an evangelical plaintiff that wanted to pass out Christian literature at that festival. But what was going on at the festival, there was a booth requirement like there is in this case, but they wouldn't give the plaintiff a booth like everybody else. They said, you can have a booth, but it's got to be away from everybody else, or you can have a drop-off location. You can put your materials there, and people can come and get them and leave. Well, at the oral argument in that case, at about the 33-minute mark, one of the judges asked Mr. Kellum, they said, I don't understand what your plaintiff is after here. Is he saying that he's entitled to a booth or a booth plus, meaning he ought to be able to walk around the facility? Mr. Kellum responded and said, Your Honor, I'm saying that he's entitled to the booth, but that's the problem in the case. They won't give him a booth like everybody else. Well, that's exactly what the plaintiff has been offered in this case is the booth like everybody else. So I'll submit that Mr. Kellum got it right the first time in the Johnson case that these are certainly content-neutral, reasonable time, place, and amount of restrictions that courts have deemed to be valid. Judge Davis, you asked a question about the size of these streets. Well, at page 123 in the record, that shows the kind of enclosed space that we have going on here. The Canal Street, where part of the festival is held on, is about four-tenths of a mile. And Main Street, what you really have is kind of like a hill. You have the Canal Street that is straight and is separated by the railroad tracks. And then the festival goes off to the right onto Main Street. And Main Street is about two-tenths of a mile, and Canal Street is four-tenths of a mile. We also have the width of the streets there. They go anywhere from 40 feet to 60 feet. So this is a very enclosed space that we're talking about that the pictures, I think, illustrate the kind of crowds that may come to the festival. And if you look at some of the pictures in the record that shows around this railroad track where the plaintiff asserts that he wants to stand, you'll see that it's not like this is some area away from the booths. The booths are in very close proximity. Obviously, they can't be on top of the railroad tracks, but they're still very, very close. What this really boils down to is that Mr. Stockdale wants to put his interests above the interests of the festival and everyone else that attends the festival, and that's not at all what the First Amendment requires. There's a case that came out just several weeks ago before oral argument, another Seventh Circuit case, where Judge Easterbrook said that you've got to be especially careful in cases like this when you have content-neutral rules and you start making exceptions for people who try to invoke the First Amendment for these content-neutral rules because it calls into question the government's ability to be able to enforce these rules against anybody. And, Judge Jones, you made that same point 10 years earlier in the City of Waco parade case, the Knowles case, that when you have situations like here and you have content-neutral rules, then you have to be very careful about making exceptions, and that's not what the First Amendment requires PICU to do, especially in a case like this one where there are satisfactory alternatives. Mr. Stockdale has alternatives both inside the street festival and outside the street festival. If he wants to preach inside the festival, he can do so just without amplification. The district court discussed this at length in its oral ruling and cited cases where that's been deemed an alternative. And Mr. Stockdale's own affidavit in the record also makes the point that he often speaks without amplification, which in and of itself suggests that it's a satisfactory alternative to it. And if he wants to distribute literature inside the festival, then he can get a booth like everybody else does and like his own church has at past festivals. But if neither of those options are satisfactory to him, then he also has options outside the festival. He can have sound amplification within a short distance of the festival. Is there a limit on how far away from the street he has to be? Well, I think that the record shows at the past festival, for example, the March 2015 festival, it was the chief of police's understanding that he would be about 20 or 25 feet from the festival at this area that is away from the railroad tracks. But I think it would just depend on how... I mean, he may implicate the ordinance if he gets so close that it would be raucous to an unreasonable person. But I think what the city of Pickingham contemplates is that they're willing to let him get within a close distance. He just can't be right on top of everybody with the sound amplification inside the festival because that implicates aggregation and there's no way they could have this festival if you had everyone walking around with amplification devices. And he also has the literature distribution option on the outside of the festival. He can walk around the borders of the festival and catch people as they go in and outside of the festival. These barricades that... As I appreciate it, it's these steel barricades that block nothing but vehicular traffic so people can walk in and out. So he can go anywhere that he wants to on the borders and distribute the literature. Mr. Butler, I think we have your argument. Okay. Thank you, Your Honor. I appreciate it. Okay, Mr. Kellen, back to you. Thank you, Judge Davis. There's no question that it would be unconstitutional to ban literature distribution on a public street or public sidewalk where you have pedestrian traffic. There's no question about that. But then you also have the Heffron case, which says that, well, you can. You can ban literature distribution in the context of solicitation in a fairground area. So then the question becomes, okay, well, what about a public street that's been closed off to vehicular traffic and public sidewalks that are part of a public festival? So it's a little different, right? than either one of those. And what the Sixth Circuit has held in the Bays case and also in the SIA case, and what the Eighth Circuit has held in the Johnson v. Minneapolis Park and Recreation Board case is that this is not like Heffron. This is different from Heffron in that you cannot ban literature distribution on a public street during a public festival. So I think what's really before this court is whether or not this court wants to depart from what some sister circuits have done, which this court can do. But it would be in conflict with what the Sixth and the Eighth have said and how they interpret Heffron. And also, in all candor, I believe it would betray the true reading of Heffron, that Heffron really would not support the idea that you could ban literature distribution during a public festival. So I would submit that that is before the court, and what I would ask the court to do is to actually go along with the sister circuits of the Sixth and the Eighth and uphold the same reasoning of Heffron and to overturn the decision of the district court below and grant Mr. Stocksdale the relief he needs just to merely hand out literature and to speak with a conversational tone so that he could be heard. Thank you, judges. Thank you very much. Thank you, gentlemen. We have your case.